## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                        No. CR 16-4566 JB

PETER CALVERT-CATA,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Amended Petition for Revocation of Supervised Release, filed December 10, 2021 (Doc. 84)("Petition"). The Court held evidentiary revocation hearings on April 13, 2022, see Clerk's Minutes, filed April 13, 2022 (Doc. 100)("April 13 Clerk's Minutes"), and May 17, 2022, see Clerk's Minutes, filed May 17, 2022 (Doc. 104)("May 17 Clerk's Minutes"). The primary issues are: (i) whether a preponderance of the reliable evidence supports a finding that Defendant Peter Calvert-Cata violated his supervised release mandatory condition by committing a battery against his girlfriend, Thelma Encinias, on November 14, 2021, in violation of N.M.S.A. § 30-3-16(C); and (ii) whether a preponderance of the reliable evidence supports a finding that Peter Calvert-Cata violated his supervised release mandatory condition by kidnapping Encinias on November 14, 2021, in violation of N.M.S.A. § 30-4-01(A). The Court concludes by a preponderance of the evidence that: (i) Calvert-Cata strangled Encinias in violation of N.M.S.A. § 30-03-16(C); (ii) Calvert-Cata did not kidnap Encinias in violation of N.M.S.A. § 30-04-01(A); and, by extension, (iii) Calvert-Cata violated a mandatory condition of his supervised release that he not commit another federal, state, or local crime. Accordingly, because Calvert-Cata committed a Grade A violation and has a criminal

history category of I, the United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines") establish a revocation imprisonment range of 24 to 30 months.

## PROCEDURAL BACKGROUND

On February 7, 2018, the Court sentenced Calvert-Cata to 48 months imprisonment for one count of violating 18 U.S.C. §§ 1153 and 2242(2), for committing sexual abuse in Indian Country. See Judgment at 1, filed February 7, 2018 (Doc. 61).  The Court imposed 10 years of supervised release following Calvert-Cata's release from custody.  See Judgment at 3.

For supervised release, the Court imposed three mandatory conditions, seventeen standard conditions, and fourteen special conditions.  See Judgment at 3-7.  One of Calvert-Cata's mandatory conditions is: "You must not commit another federal, state, or local crime."  Judgment at 3.  One of his standard conditions is: "After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed."  Judgment at 3.  Calvert-Cata began his supervised release on May 27, 2020, and supervision is set to expire on May 25, 2030.  See United States Probation Office Violation Report, filed December 10, 2021 (Doc. 85)("Violation Report").

The Court modified Calvert-Cata's supervised release conditions three times: (i) on May 26, 2020, see Request for Modifying the Conditions or Term of Supervision, filed May 26, 2020 (Doc. 65)("May Request"); Order, filed May 26, 2020 (Doc. 66)("May Order"); (ii) on August 27, 2020, see Request for Modifying the Conditions of Supervised Release, filed August 24, 2020 (Doc. 67)("August Request"); Order, filed August 27, 2020 (Doc. 68)("August Order"); and (iii) on October 13, 2021, see Request for Modifying the Conditions of Term of Supervision with

the Consent of the Offender, filed September 23, 2021 (Doc. 78)("October Request"); Order, filed October 13, 2021 (Doc. 79)("October Order").

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d)'s purposes. The Court makes these findings by a preponderance of the evidence. See 18 U.S.C. § 3583(e)(3). The Federal Rules of Evidence do not apply to revocation proceedings. [1]  See United States v. Henry, 852 F.3d 1204, 1206 (10th Cir. 2017). Instead, in making these findings, the Court does not consider any evidence or testimony from the hearing that violates the United States Court of Appeals for the Tenth Circuit's holding in United States v. Jones, 818 F.3d 1091, 1099-100 (10th Cir. 2016)("Jones").

1.     **Initial Compliance with Conditions of Supervised Release.**

1.     Calvert-Cata began his 10-year supervised release term on May 27, 2020, after

---

[1]The Federal Rules of Evidence do not apply in revocation hearings. See United States v. Henry, 852 F.3d at 1206; Fed. R. Evid. 1101(d)(3). Sixth Amendment rights, including the confrontation rights the Supreme Court announced in Crawford v. Washington, 541 U.S. 36 (2004)("Crawford"), also do not apply in revocation hearings. See Curtis v. Chester, 626 F.3d 540, 544 (10th Cir. 2010). The Court's analysis in this Memorandum Opinion and Order, however, uses the Federal Rules of Evidence and Crawford to help determine what evidence to rely upon. The Court's analysis should not be read for the proposition that the Federal Rules of Evidence and Crawford apply in revocation hearings. Instead, it should be read for the proposition that courts presiding over revocation hearings should be able to rely upon out-of-court statements that would be admissible under the Federal Rules of Evidence and Crawford if they were offered at trial, regardless of whether the declarant is available to testify at the revocation hearing.

serving 48 months in custody for one count of violating 18 U.S.C. §§ 1153 and 2242(2), for committing sexual abuse in Indian Country.  See Violation Report at 1.

2.      Calvert-Cata "was initially expected to transition from Bureau of Prisons custody to residing at [a] Residential Reentry Center [("RRC")] in Albuquerque, New Mexico for a period of six months."  Violation Report at 1.  There was, however, a COVID-19 outbreak at the RRC where Calvert-Cata was supposed to be placed, so the United States Probation Office ("USPO") requested that the Court modify the conditions of supervised release to allow Calvert-Cata to live with his maternal grandmother on the San Juan Pueblo in Ohkay Owingeh, New Mexico instead. See Violation Report at 1; May Request.

3.      On May 26, 2020, the Court modified Calvert-Cata's release conditions to permit him to live at his grandmother's house under "home incarceration" while on a 3-month "location monitoring program with the Active Global Positioning Satellite (GPS) technology under the home incarceration competent."   See May Order.

4.      On May 27, 2020, Calvert-Cata reported to the USPO office in Albuquerque for his "initial intake and placement on the location monitoring program."  Violation Report at 1.

5.      During the May 27, 2020, meeting with the USPO, Calvert-Cata reviewed and signed his supervised release conditions, indicating that he "understood what was expected of him during his term of supervision."  Violation Report at 1.

6.      The USPO referred Calvert-Cata to the Life Link in Santa Fe, New Mexico, for a substance abuse assessment.  See Violation Report at 1.

7.      The substance abuse assessment provides a "diagnosis of F10.11-Alcohol abuse" that is "in remission due to incarceration (moderate)," and recommends that Calvert-Cata

participate in individual counseling.  Violation Report at 1.

8.      The USPO also referred Calvert-Cata to Lani Solutions, LLC, for a Problematic Sexual Behavior Evaluation and Report, which relates that, "[a]t the time of the assessment," Calvert-Cata "did not portray dangerous or violent tendencies in normal circumstances, but with negative peer influences and substances," Calvert-Cata "may be easily pressured and susceptible to criminal thinking."  Violation Report at 1.

9.      On August 24, 2020, the USPO requested that the Court extend Calvert-Cata's location monitoring condition for 3 additional months pending placement at an RRC.   See Violation Report at 1; August Request.

10.     On August 27, 2020, the Court modified Calvert-Cata's supervised release conditions in accordance with the USPO's August Request.  See Violation Report at 1; August Order.

11.     Calvert-Cata's treatment at Lani Solutions ended on October 6, 2020, because Calvert-Cata was transferred to Counseling World.  See Violation Report at 1.

12.     Calvert-Cata's discharge summary from Lani Solutions notes that he "was compliant with attendance" and maintained a "receptive attitude."  Violation Report at 1.

13.     The discharge summary also indicates that Calvert-Cata was "new to treatment," "had yet to demonstrate awareness around cognitive distortions or formative experiences," and "had yet to articulate an understanding [that] he has/had problematic sexual attractions to young women."  Violation Report at 1.

**2.      The December 21, 2020 Incident.**

14.     Calvert-Cata gained employment at Kentucky Fried Chicken on November 16,

2020.  See Violation Report at 2.

15.     On December 21, 2020, Calvert-Cata had a physical altercation at work with "a male who is not an employee."  Violation Report at 2.

16.     The USPO learned of the altercation from Calvert-Cata's mother.  See Violation Report at 2.

17.     After the altercation, Calvert-Cata "consumed six miniatures of alcohol."  Violation Report at 2.

18.     After the altercation, Calvert-Cata also "became paranoid" and did not tell USPO where he was, but he "subsequently disclosed his whereabouts and returned home."  Violation Report at 2.

19.     The USPO contacted Calvert-Cata on December 22, 2020, and instructed him to report for a random alcohol test at Hoy Recovery, and Calvert-Cata complied with that instruction.  See Violation Report at 2.

20.     His blood alcohol content registered 0.095 and 0.094.  See Violation Report at 2.

21.     After his alcohol testing, Calvert-Cata "attempted to stall on drug testing by requesting more time to produce a specimen," but, after being denied more time, "submitted a urine specimen."  Violation Report at 2.

22.     After the December 21, 2020 incident, neither Calvert-Cata's maternal grandmother nor Calvert-Cata's parents wanted Calvert-Cata to live at Calvert-Cata's maternal grandmother's house.  See Violation Report at 2.

**3.     Placement at Dierson RRC.**

23.     The USPO placed Calvert-Cata at Dierson RRC on December 23, 2020.  See

Violation Report at 2.

24.     On January 11, 2021, Calvert-Cata "obtained employment at Riccobene Masonry in Albuquerque, New Mexico."  Violation Report at 2.

25.     During his 6 months at Dierson RRC, Calvert-Cata  was "compliant with the rules and regulations of the program."  Violation Report at 2.

**4.     Return to Life in Albuquerque.**

26.     Calvert-Cata obtained his own apartment in Albuquerque on June 22, 2021.  See Violation Report at 2.

27.     The USPO conducted an unannounced home visit on August 31, 2021.  See Violation Report at 2.

28.     The USPO conducted another unannounced home visit on October 28, 2021, but Calvert-Cata was not home.  See Violation Report at 3.

29.     The USPO contacted Calvert-Cata on October 28, 2021, and learned that he was next door.  See Violation Report at 3.

30.     Calvert-Cata was with a female friend, Encinias, next door.  See Violation Report at 3.

31.     Calvert-Cata and Encinias had been "talking" and they liked each other, but "denied any intimacy or romantic relationship" at that time.  Violation Report at 3.

32.     Encinias knew that Calvert-Cata was on federal supervised release.  See Violation Report at 3.

33.     Calvert-Cata and Encinias began dating in mid-October 2021.  See Violation Report at 3; Affidavit for Arrest Warrant at 7, filed April 13, 2022 (Doc. 100-3)("Warrant Aff.").

5.    **The November 14, 2021, Incident.**

34.    On November 14, 2021, at approximately 8:52 p.m., Encinias called 911 ("the 911 Call").  See Warrant Aff. at 2.

35.    During the 911 Call, Encinias informed the operator that her boyfriend was battering her.  See Warrant Aff. at 2.

36.    She identified Calvert-Cata as her boyfriend.  See Warrant Aff. at 2.

37.    Encinias told the operator that she was calling from Calvert-Cata's car, a black Buick sedan, where she had locked herself in to prevent him from battering her more.  See Warrant Aff. at 2.

38.    The call was geolocated to the area of Earth Lane and Hummingbird Lane in Española, New Mexico.  See Warrant Aff. at 2.

39.    The operator dispatched three officers from the Rio Arriba Sheriff's Office -- Sergeant Jack Casius and Deputies Andres Sanchez and Cedric Patterson -- to the scene.  See Warrant Aff. at 2; Draft Transcript of Hearing at 10:8-9 (taken May 17, 2022)(Nayback)("May 17 Tr.").[2]

40.    When the officers arrived, they began looking for the vehicle, but could not find it immediately.  See May 17 Tr. at 6:9-10 (Casius).

41.    The surrounding area is "very rural" with a many "trees [and] a lot of brush."  May 17 Tr. at 9:17-19 (Casius).

---

[2]The Court's citations to the transcript of the May 17 hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

42.     While they were searching for the vehicle, a woman and a dog came running out of the tree line towards the officers.  See May 17 Tr. at 6:11-12 (Casius).

43.     The woman appeared "frantic[];" she was "crying and visibly shaken, extremely scared."  May 17 Tr. at 6:13-14 (Casius).

44.     She approached the officers and "started telling [them] what happened" ("Initial Encounter").  May 17 Tr. at 6:18-19.

45.     During the Initial Encounter, the woman identified herself as Encinias.  See Warrant Aff. at 2.

46.     Encinias told the officers that Calvert-Cata "had punched, choked, and threatened to rape and kill her."  Warrant Aff. at 2.

47.     She also told the officers that they could find Calvert-Cata and his car at a dead end at the end of the road.  See May 17 Tr. at 7:2-3 (Casius); Warrant Aff. at 2.

48.     The officers noted that Encinias had bruises on the left side of her face and neck, as well as bruising on her left wrist.  See May 17 Tr. at 10:24-25; Photos of Thelma Encinias, filed April 13, 2022 (Doc. 100-4 at 1("Encinias Photo I"), 2 ("Encinias Photo II"), 3 ("Encinias Photo III"), 5 ("Encinias Photo IV")).

49.     The officers believed, based on their training and experience, that Encinias' injuries were "something that she had sustained that evening."  May 17 Tr. at 12:5-6 (Casius).

50.     The officers secured Encinias and her dog in the back of one of their police vehicles. See May 17 Tr. at 7:21 (Casius).

51.     The officers began to search for Calvert-Cata's vehicle.  See May 17 Tr. at 7:1 (Casius).

52.     Moments later, the officers located the vehicle.  See May 17 Tr. at 7:4-5 (Casius).

53.     The car was not running and no one was inside the vehicle.  See Warrant Aff. at 2.

54.     The officers noted that there were footprints on the hood and on the vehicle's top.
See May 17 Tr. at 8:8-9 (Casius).

55.     The officers ran the license plate number and learned that the vehicle was registered
in Calvert-Cata's name.  See May 17 Tr. at 9:7-8 (Casius).

56.     The officers determined that Encinias was in Calvert-Cata's vehicle "prior to her
approaching and running up to [them] frantically."  May 17 Tr. at 9:9-12 (Casius).

57.     The officers proceeded to search for Calvert-Cata.  See May 17 Tr. at 9:15-21
(Casius).

58.     They formed a "search line" and "canvass[ed]" the area, but they could not locate
him.  May 17 Tr. at 9:20-21 (Casius).

59.     The officers determined that Calvert-Cata had "fled."  May 17 Tr. at 9:21 (Casius).

60.     The officers returned to their vehicles and again spoke to Encinias ("Second
Encounter").[3]  See May 17 Tr. at 10:5-7 (Casius).

61.     After obtaining an oral statement from Encinias during the Second Encounter, the
officers transported her to the Rio Arriba County Sheriff's Office.  See Warrant Aff. at 2.

62.     At the Sheriff's Office, Encinias completed a Voluntary Statement Domestic
Violence/Violence Against Persons form.  See Voluntary Statement Domestic Violence/Violence

---

[3]For the reasons discussed in greater detail below, the Court declines to rely upon Encinias'
statements in the Second Encounter.  Accordingly, the Court does not use the contents of those
statements to make findings of fact.

Against Persons at 14-16, filed April 13, 2022 (Doc. 100-3)("Voluntary Statement").[4]

63.     She also provided a written statement.  See Voluntary Statement at 1, 3, filed April 13, 2022 (Doc. 100-2)("Written Statement").[5]

### 5.  **Aftermath of the November 14, 2021, Incident.**

64.     On November 16, 2021, the Rio Arriba County Sheriff's Office, State of New Mexico, charged Calvert-Cata with Kidnapping (First Degree) in violation of N.M.S.A. § 30-4-01(A), and with Aggravated Battery (Strangulation), in violation of N.M.S.A. § 30-3-16(C).  See Violation Report at 3.

65.     Calvert-Cata contacted USPO Officer Jeffrey S. Tanny on December 2, 2021.  See Violation Report at 4.

66.     Tanny told Calvert-Cata that he "had two outstanding warrants" and "encouraged" him to surrender to the United States Marshal's Office.  Violation Report at 4.

67.     Tanny also instructed Calvert-Cata to report to the USPO on Friday, December 3, 2021, at 8:00 a.m., but Calvert-Cata did not report.  See Violation Report at 4.

### ADDITIONAL PROCEDURAL BACKGROUND

On November 15, 2021, the State charged Calvert-Cata with Kidnapping (First Degree) and Aggravated Battery (Strangulation), in violation of N.M.S.A. §§ 30-04-01(A) and 30-03-16(C), respectively.  See Petition at 2.  Kidnapping (First Degree) is a first-degree felony.  See

---

[4]For the reasons discussed in greater detail below, the Court declines to rely upon the Voluntary Statement.  Accordingly, the Court does not use the contents of the Voluntary Statement to make findings of fact.

[5]For the reasons discussed in greater detail below, the Court declines to rely upon the Written Statement.  Accordingly, the Court does not use the contents of the Written Statement to make findings of fact.

N.M.S.A. § 30-4-01(A).  Aggravated Battery (Strangulation) is a third-degree felony.  <u>See</u>
N.M.S.A. § 30-3-16(C).

On December 10, 2021, the USPO alleged that Calvert-Cata violated two supervised
release conditions.  <u>See</u> Petition at 2.  First, the USPO asserts that Calvert-Cata violated his
mandatory condition that he must not commit another federal, state, or local crime, by kidnapping
Encinias on November 14, 2021, between 3:00 p.m. and 8:52 p.m.  <u>See</u> Petition at 2.  The USPO
alleges that the victim reported that Calvert-Cata "kidnapped her and took her to a location in Rio
Arriba County near Espanola, New Mexico," and that Calvert-Cata "physically struck her and
strangled her before she was able to call 911."  Petition at 2.  Second, the USPO alleges that
Calvert-Cata violated his standard condition that he report to the probation officer as instructed by
"failing to report as instructed" on December 3, 2021.  Petition at 2.  The USPO states that the
maximum statutory penalty for these violations is 5 years imprisonment followed by 5 years to life
of supervised release, and notes that the Guideline revocation imprisonment range is 24 to 30
months.  <u>See</u> Petition at 2.  On December 16, 2021, the Court issued an order for Calvert-Cata's
arrest.  <u>See</u> Order for Issuance of Arrest Warrant, filed December 16, 2021 (Doc. 86)(text-only
entry).

The Court held a hearing on the Petition on April 13, 2022.  <u>See</u> April 13 Clerk's Minutes.
At the hearing, Calvert-Cata admitted to violating his standard condition by failing to report to the
USPO on December 3, 2021, but not the mandatory condition.  <u>See</u> Draft Transcript of Hearing at
6:11-16 (taken April 13, 2022)(Baiz)("April 13 Tr.").[6]  The United States indicated that it intended

---

[6]The Court's citations to the transcript of the April 13 hearing refer to the court reporter's
original, unedited version.  Any final transcript may contain slightly different page and/or line

to present evidence.  See April 13 Clerk's Minutes at 2.  The United States called Tanny.  See April 13 Clerk's Minutes at 2.  During Tanny's testimony, the United States introduced and moved to admit three exhibits: (i) the Written Statement; (ii) a State of New Mexico Uniform Incident Report, filed April 13, 2022 (Doc. 100-3), which contains Encinias' Voluntary Statement; and (iii) photos of Encinias, including Encinias Photos I, II, III and IV.  See April 13 Clerk's Minutes at 2.  Calvert-Cata initially objected to the admission of the three exhibits, but then withdrew his objection stating, "I'll just cross-examine [Tanny] on them."  April 13 Tr. at 11:14-15 (Baiz). Throughout his testimony, Tanny relied on many of Encinias' out-of-court statements.  See, e.g., April 13 Tr. at 12:11-13:11 (Tanny); id. at 16:10-16 (Tanny).  At the end of the hearing, the Court asked the United States if it planned to elicit testimony from Encinias or from one of the officers that responded to Encinias' 911 Call on November 14, 2021.  See April 13 Tr. at 31:17-21 (Court). The United States indicated that it would try to elicit testimony from Encinias, but that it is "not optimistic that [she is] going to be willing to work with the Government."  April 13 Tr. at 32:3-6 (Nayback).  At the conclusion of the hearing, the Court took Calvert-Cata's plea on the standard condition violation.  See April 13 Tr. at 32:11-37:1 (Court. Baiz, Calvert-Cata).

The Court held a second hearing on the Petition on May 17, 2022.  See May 17 Clerk's Minutes.  At that hearing, the United States called Casius to testify.  See May 17 Clerk's Minutes at 2.  Casius was one the three officers that responded to the 911 Call on November 14, 2021.  See May 17 Tr. at 4:23-24 (Casius).  Throughout his testimony, Casius relied on several of Encinias' out-of-court statements.  See, e.g., May 17 Tr. at 6:1-5 (Casius); id. at 7:15-8:2 (Casius); id. at

---

numbers.

11:12-20 (Casius).  During cross examination of Casius, Calvert-Cata moved to enter two exhibits: (i) a Voluntary Statement Domestic Violence/Violence Against Persons, filed May 17, 2022 (Doc. 104-1); and (ii) a Towing Authorization, filed May 17, 2022 (Doc. 104-2).  See May 17 Clerk's Minutes at 2.

After the parties rested, the United States noted that it sought testimony from Encinias, but that she was unwilling to testify.  See May 17 Tr. at 47:1-48:4 (Nayback).  The United States offered three explanations for Encinias' absence.  First, the United States explained that Encinias is afraid of Calvert-Cata.  See May 17 Tr. 47:1-3 (Nayback).  Next, the United States asserted that, from its perspective, there is "a certain amount of revictimization that goes on by having to tell her story again in front of the defendant."  May 17 Tr. at 47:13-15 (Nayback).  Finally, the United States noted that Encinias may testify in State court about the incident, and "so we don't get super excited about calling a victim first in a federal supervised release hearing," which might "create a record" with "small inconsistencies."  May 17 Tr. at 47:19-22 (Nayback).

Several months later, Calvert-Cata filed the Defendant's Memorandum for Sentencing Upon Violation of Supervised Release, filed October 12, 2022 (Doc. 109)("Calvert-Cata's Sentencing Memo").  In Calvert-Cata's Sentencing Memo, Calvert-Cata asks the Court to disregard Encinias' out-of-court statements that were presented at the revocation hearings, because they violate his right to confrontation.  Calvert-Cata's Sentencing Memo at 2.  In making this argument, he relies on the United States Court of Appeals for the Tenth Circuit's balancing test from Jones, 818 F.3d at 1099-100.  The Tenth Circuit applies the Jones test where the United States relies on out-of-court testimony from a non-testifying declarant at a revocation hearing.  See Jones, 818 F.3d at 1097-98.  The test requires the Court to "balanc[e] (1) 'the [defendant]'s interest in the

constitutionally guaranteed right to confrontation' against (2) 'the government's good cause for denying it.'" Jones, 818 F.3d at 1100 (quoting Advisory Committee's Note to the 2002 Amendment to Fed. R. Crim. P. 32.1). Calvert-Cata asserts that the balance of interests is in his favor and compels the Court to disregard Encinias' out-of-court statements. Calvert-Cata's Sentencing Memo at 3-4. He also argues that, in the absence of those out-of-court statements, the "only charge that the court should consider against [him] is his admission that he failed to report to the probation officer as instructed." Calvert-Cata's Sentencing Memo at 4. He asks the Court to impose "a sentence of 9 months and two years of supervised release." Calvert-Cata's Sentencing Memo at 4. Two days later, on October 14, 2022, Calvert-Cata filed the Sealed Supplement to Defendant's Sentencing Memorandum, filed October 14, 2022 (Doc. 110)("Calvert-Cata's Supplemental Sentencing Memo"). Calvert-Cata's Supplemental Sentencing Memo indicates that the State has dismissed its prosecution of Calvert-Cata. See Nolle Prosequi, filed October 14, 2022 (Doc. 110-1).

## LAW REGARDING THE SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States severed the mandatory provisions from the Sentencing Reform Act, Pub. L No. 98-473, 98 Stat. 1837, 1987, thus making the Guidelines sentencing ranges effectively advisory. In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four statutorily defined purposes that 18 U.S.C. § 3553(a)(2) enumerates:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551(a).  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the offense's nature, and the nature of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines sentences are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission

examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate"); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 35 (2007). The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] 'represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'" United States v. Cage, 451 F.3d at 593 (quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349). A reasonable sentence is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). See United States v. Booker, 543 U.S. at 261-62.

Finally, the Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d at 1264. This presumption is an appellate presumption, however, and not one that the trial court can or should apply. See Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 350-51 (repeating that the presumption of reasonableness "is an *appellate* court presumption")(emphasis in original). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory Guidelines sentence. See Kimbrough v. United States, 552 U.S. at 90-91; Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 351.

### LAW REGARDING SUPERVISED RELEASE REVOCATION AND REVOCATION HEARINGS

Subsection (e)(3) of § 3583 of Title 18 of the United States Code permits courts to revoke supervised release after concluding that the defendant violated a supervised release condition by a preponderance of the evidence.  See 18 U.S.C. § 3583(e).  Section 3583(e)(3) sets forth the process for revoking supervised release:

> **(e)     Modification of conditions or revocation**. -- The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) --
>
> . . .
>
>> (3)      revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve on any such revocation more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony, more than 3 years in prison if such offense is a class B felony, more than 2 years in prison if such offense is a class C or D felony, or more than one year in any other case . . . .

18 U.S.C. § 3583(e)(bold in original).  "Preponderance of the evidence" is "evidence sufficient to persuade you that a fact is more likely present than not present."  10th Cir. Crim. Pattern Jury Instructions No. 1.05.1.  It is:

> The greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other.

"Preponderance of the Evidence," Black's Law Dictionary (11th ed. 2019).

Where, as here, revocation of supervised release is contested, courts must hold a revocation hearing.  See Fed. R. Crim. P. 32.1(b)(2).  Rule 32.1 of the Federal Rules of Criminal Procedure governs revocation hearings.  See Fed. R. Crim. P. 32.1.  Rule 32.1 provides in relevant part:

> (2)   Revocation Hearing. Unless waived by the person, the court must hold the revocation hearing within a reasonable time in the district having jurisdiction. The person is entitled to:
>
>   (A)   written notice of the alleged violation;
>
>   (B)   disclosure of the evidence against the person;
>
>   (C)   an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear;
>
>   (D)   notice of the person's right to retain counsel or to request that counsel be appointed if the person cannot obtain counsel; and
>
>   (E)   an opportunity to make a statement and present any information in mitigation . . . .

Fed. R. Crim. P. 32.1(b).

Although rule 32.1(b)(2) provides for a revocation hearing, the hearing is "not a formal trial."  Comment to Rule 32.1(a)(2).  Instead, revocation hearings are to be more flexible and inclusive than criminal trials.  See Morrissey v. Brewer, 408 U.S. 471, 489 (1972).[7]  The parties

---

[7]Rule 32.1 was adopted in 1979.  See Advisory Committee Notes on Fed. R. Crim. P. 32.1. It replaced the former "revocation of parole" system with a new "revocation of supervised release" system.  See Advisory Committee Notes on Fed. R. Crim. P. 32.1.  The United States Supreme Court decided Morrissey v. Brewer in 1972, prior to the adoption of rule 32.1.  Accordingly, the Supreme Court's analysis concerns revocation of parole, not revocation of supervised release. Nevertheless, the Tenth Circuit has interpreted Morrissey v. Brewer to apply to revocation of supervised release.  See, Jones, 818 F.3d at 1098-99 (discussing Morrissey v. Brewer as part of the history and development of rule 32.1).

may call witnesses and present evidence, but the process "should be flexible enough to consider evidence including letters, affidavits, and <u>other material that would not be admissible in an adversary criminal trial</u>." <u>Morrissey v. Brewer</u>, 408 U.S. at 489 (emphasis added).  To that end, the Federal Rules of Evidence do not apply in revocation hearings.  <u>See</u> Fed. R. Evid. 1101(d)(3) ("These rules -- except for those on privilege -- do not apply to . . . miscellaneous proceedings such as . . . granting or revoking probation or supervised release . . . ."); <u>United States v. Diaz</u>, 986 F.3d 202, 209 (2d Cir. 2021).

Also in service of flexibility and inclusivity, defendants have a lesser right to confrontation in revocation hearings.  <u>See</u> <u>Jones</u>, 818 F.3d at 1098.  Instead of running through a standard confrontation analysis like the one the Supreme Court of the United States provides in <u>Crawford v. Washington</u>, 541 U.S. 36 (2004)("<u>Crawford</u>"), courts presiding over revocation hearings engage in a balancing test.  <u>See</u> <u>Jones</u>, 818 F.3d at 1099-100.  When the United States relies on an out-of-court statement by a non-testifying declarant in a revocation hearing, the court "must determine whether the 'interest of justice does not require the witness to appear' by balancing (1) 'the person's interest in the constitutionally guaranteed right to confrontation' against (2) 'the government's good cause for denying it.'"  <u>Jones</u>, 818 F.3d at 1099-100 (quoting Advisory Committee Notes to the 2002 Amendment to Fed. R. Crim. P. 32.1).  The testimony's "reliability is a very important factor in determining the strength of a releasee's confrontation right.'"  <u>Jones</u>, 818 F.3d at 1100 (quoting <u>Curtis v. Chester</u>, 626 F.3d 540, 546 (10th Cir. 2010)(emphasis omitted in <u>Jones</u>, but in <u>Curtis v. Chester</u>)).

Although rule 32.1 of the Federal Rules of Criminal Procedure and the <u>Jones</u> balancing test are geared toward decreasing procedural protections for defendants in revocation hearings and

increasing the universe of evidence courts can consider in those hearings, in practice, rule 32.1 and Jones may limit evidence unnecessarily and unwisely.  In some instances, courts presiding over revocation hearings may be compelled to disregard out-of-court statements even though those same out-of-court statements would be admissible under the Federal Rules of Evidence and Crawford if they were offered at trial, regardless of whether the declarant is available to testify at the trial.[8]   Those instances are troubling for two reasons. First, defendants in those cases are provided with a greater right to confrontation in the revocation context than they are in the trial context.  It is difficult -- if not impossible -- to square that outcome with the Tenth Circuit's guidance that defendants are supposed to have a more limited right to confrontation in the revocation setting than they do in the trial setting.  See Jones, 818 F.3d at 1098.  Second, courts in those cases are forced to rely on smaller universes of evidence than they would be able to in the trial setting.  Again, it is difficult -- if not impossible -- to reconcile that result with the Supreme Court's guidance in Morrissey v. Brewer that courts presiding over revocation hearings should be

---

[8]The Court confronted a similar issue in United States v. Hernandez, 428 F. Supp. 3d 775 (D.N.M. 2019)(Browning, J.).  There, an officer responded to a domestic disturbance in Rio Rancho, New Mexico.  See 428 F. Supp. 3d at 782.  When the officer arrived at the scene, the victim "appeared distressed," and told the officer that the defendant had assaulted her and attempted to set fire to a kitchen, among other things.  428 F. Supp. 3d at 782.  The defendant was on supervised release at the time, and the United States subsequently petitioned to revoke his supervised release.  See 428 F. Supp. 3d at 780.  At the hearing, the United States did not call the victim, yet it relied on her statements to the officer on the scene.  See 428 F. Supp. 3d at 781.  The Court applied the Jones balancing test and determined that it could not consider the victim's out-of-court statements to the officer.  See 428 F. Supp. 3d at 788.  Those out-of-court statements, however, would have been admissible hearsay in a trial setting as either a present sense impression or excited utterance, see Fed. R. Evid. 803(1), (2), and if the Court had used the analysis it now adopts, the result would have been different.

able to consider "material that would not be admissible in an adversary criminal trial." 408 U.S. at 489.

The Honorable Andrew S. Oldham, United States Circuit Judge for the United States Court of Appeals for the Fifth Circuit, documents this paradox in his concurring opinion in United States v. Alvear, 959 F.3d 185, 191 (5th Cir. 2020)(Oldham, J., concurring).  In his concurrence, Judge Oldham discusses "three oddities" in rule 32.1 caselaw.  United States v. Alvear, 959 F.3d at 193 (Oldham, J., concurring).[9]  First, he notes that "it's unclear what if anything the Due Process Clause adds to the protections of Rule 32.1(b)(2)(C)."  United States v. Alvear, 959 F.3d at 193 (Oldham, J., concurring).  Second, he observes that, "instead of applying Rule 32.1(b)(2)(C), many of our decisions in this area contain nary a citation to it."  United States v. Alvear, 959 F.3d at 193 (Oldham, J., concurring).  Finally, he describes, "oddest of all, sometimes confrontation rights in a revocation hearing can be *broader* than the confrontation right at trial."  United States v. Alvear, 959 F.3d at 193 (Oldham, J., concurring)(emphasis in original).

> The Supreme Court has told us that protections in a revocation hearing are (at most) the same as those at trial.  See United States v. Haymond, — U.S. —, 139 S. Ct. 2369, 2378-79 . . . (2019) (plurality opinion); id. at 2385-86 (Breyer, J., concurring in the judgment).  That result creates its own difficulties. See id. at 2390-91 (Alito, J., dissenting).  But it's an altogether different problem to make the constitutional protections in the revocation hearing broader than at trial.  After all, one premise of our system is that post-conviction rights are generally narrower because "[o]nce a defendant has been afforded a fair trial and convicted of the

---

[9]The Fifth Circuit does not use the Jones test.  It uses, however, a balancing test analogous to Jones test, as does every other circuit that has handled a rule 32.1 issue.  See United States v. Taveras, 380 F.3d 532, 536 (1st Cir. 2004); United States v. Chin, 224 F.3d 121, 124 (2d Cir. 2000); United States v. Lloyd, 566 F.3d 341, 344 (3d Cir. 2009); United States v. Doswell, 670 F.3d 526, 530 (4th Cir. 2012); Barnes v. Johnson, 184 F.3d 451, 454 (5th Cir. 1999); United States v. Jackson, 422 Fed. App'x 408, 410-11 (6th Cir. 2011)(unpublished); United States v. Jordan, 742 F.3d 276, 279 (7th Cir. 2014); United States v. Bell, 785 F.2d 640, 642 (8th Cir. 1986); United States v. Comito, 177 F.3d 1166, 1170 (9th Cir. 1999); United States v. Frazier, 26 F.3d 110, 114 (11th Cir. 1994); United States v. Stanfield, 360 F.3d 1346, 1360 (D.C. Cir. 2004).

offense for which he was charged, the presumption of innocence disappears." Herrera v. Collins, 506 U.S. 390, 399 . . . (1993).  But when we ask different questions under the Confrontation Clause at trial (is the statement "testimonial"?) and under the Due Process Clause at revocation (is there "good cause" to admit the statement?), we can get incongruous answers.

Consider an example.  A boyfriend violently attacks his girlfriend who then immediately calls 911.  The Government wants to use her statements to the 911 operator against the boyfriend.  At trial, the defendant has no right to prevent the introduction of these statements under the Confrontation Clause because they're not "testimonial."   [Ohio v. ]Clark, [576 U.S. 237 (2015)] (citing Davis v. Washington, 547 U.S. 813, 820 . . . (2006)).  But this same 911 call is almost certainly hearsay.  So at the boyfriend's revocation hearing, he can object to the introduction of the statements under the Due Process Clause, unless there is "good cause" to admit them.  See, e.g., [United States v. ]Jimison, 825 F.3d [260,] 263 [(2016)].

The oddities don't end there.  The Federal Rules of Evidence apply at trial.  And they provide for the admission of all sorts of hearsay: an excited utterance, a statement made for medical treatment, a present sense impression, a business record, a statement against interest.  See Fed. R. Evid. 803, 804.  But the hearsay rules in the Federal Rules of Evidence do not apply in revocation hearings.  Fed. R. Evid. 1101(d)(3) . . . .  So if the Government wants to use these same (otherwise-admissible) hearsay statements at a revocation hearing, the court has to apply the "good cause" analysis demanded by the Due Process Clause.  That's an additional hurdle that applies post-conviction that does not apply pre-conviction.  How odd.

United States v. Alvear, 959 F.3d at 194 (Oldham, J., concurring).

## ANALYSIS

A preponderance of the reliable evidence indicates that Calvert-Cata strangled Encinias on November 14, 2021, in violation of N.M.S.A. § 30-3-16(C).  The Court concludes, however, that it cannot find, by a preponderance of the reliable evidence, that Calvert-Cata kidnapped Encinias in violation of N.M.S.A. § 30-04-01(A).  Accordingly, a preponderance of the reliable evidence shows that Calvert-Cata violated his supervised release special condition by committing a Grade A violation.  The Guidelines establish a revocation imprisonment range of 24 to 30 months.

The Court's conclusion has three alternate bases.  First, the Court determines, without applying the Jones balancing test, that it can rely upon the 911 Call and Encinias' statements during the Initial Encounter because they are admissible under the Federal Rules of Evidence and Crawford.  Relying on Encinias' statements during the 911 Call and in the Initial Encounter, the Court concludes that a preponderance of the evidence supports a finding that Calvert-Cata committed a battery against Encinias, but not that he kidnapped her.  Second, the Court determines that even if it must run Encinias' out-of-court statements through the Jones balancing test, the Court can still rely upon Encinias' statements in the 911 Call and Initial Encounter, because the admissibility of those statements under the Federal Rules of Evidence and Crawford is good cause not to call Encinias to testify to those statements at the revocation hearing.  Finally, the Court concludes that, even if the Court determines that the United States cannot show good cause and that it must disregard all of Encinias' out-of-court statements, there is sufficient evidence to support a finding that Calvert-Cata committed a battery against Encinias on November 14, 2021.

I. **THE COURT CONCLUDES THAT IT PROPERLY CAN CONSIDER AND RELY UPON OUT-OF-COURT STATEMENTS AT A REVOCATION HEARING THAT ARE ADMISSIBLE UNDER THE FEDERAL RULES OF EVIDENCE AND CRAWFORD, WITHOUT APPLYING THE JONES ANALYSIS, EVEN IF THE WITNESS IS AVAILABLE AND THE UNITED STATES DOES NOT CALL THE WITNESS AT THE REVOCATION HEARING.**

The Court determines that it can properly rely on Encinias' statements that would have been admissible if offered at a trial -- the 911 Call and her statements in the Initial Encounter -- without running them through the Jones analysis.  The Court reaches this conclusion because evidentiary standards for revocation hearings are supposed to be more inclusive and flexible than trials.  See Morrissey v. Brewer, 408 U.S. at 489.  Some out-of-court statements are admissible in criminal trials, even if the declarant is available.  See Fed. R. Evid. 803.  Yet, in the revocation

context, courts have to run those same out-of-court statements through the <u>Jones</u> analysis and determine whether the United States had "good cause" not to call the declarant at the revocation hearing.   See <u>Jones</u>, 818 F.3d at 1099-100.   "That's an additional hurdle that applies post-conviction that does not apply pre-conviction." <u>United States v. Alvear</u>, 959 F.3d at 194 (Oldham, J., concurring).  It makes no sense to require the United States to justify why it is not calling a declarant to testify at a revocation hearing, when the United States would not have to justify its decision not to call that same declarant to testify at trial because the declarant's statements would be admissible under the Federal Rules of Evidence and <u>Crawford</u>, regardless of whether the declarant was available to testify.  It is time to "square this circle." <u>United States v. Alvear</u>, 959 F.3d at 194 (Oldham, J., concurring).   The Court squares the circle by bypassing the <u>Jones</u> balancing test and instead relying on the out-of-court statements that would have been admissible under the Federal Rules of Evidence and <u>Crawford</u> if they were offered at trial, here: the 911 Call and Encinias' statements during the Initial Encounter.

> **A.**    **ENCINIAS' STATEMENTS DURING THE 911 CALL AND INITIAL ENCOUNTER ARE ADMISSIBLE UNDER THE FEDERAL RULES OF EVIDENCE AND <u>CRAWFORD</u>, REGARDLESS OF WHETHER ENCINIAS IS AVAILABLE TO TESTIFY.**

The Court will first conduct a standard analysis of the admissibility of Encinias' out-of-court statements.  Encinias' statements during the 911 Call and the Initial Encounter are admissible under the Federal Rules of Evidence and <u>Crawford</u>, regardless of whether she is available to testify. By contrast, Encinias' statements during the Second Encounter, in the Voluntary Statement, and in the Written Statement, are not admissible under the Federal Rules of Evidence or under <u>Crawford</u>.

1.      **Encinias' Statements During the 911 Call Are Admissible Under the Rule 803(1) Present Sense Impression Exception and the Rule 803(2) Excited Utterance Exception, Regardless of Her Availability to Testify.**

Under rule 801(c) of the Federal Rules of Evidence, "'[h]earsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "Hearsay testimony is generally inadmissible." Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc., No. CIV 10-0698 JB/RHS, 2013 WL 311846, at *13 (D.N.M. Jan. 18, 2013)(Browning, J.)(citing Fed. R. Evid. 802). There are, however, several exclusions from and exceptions to that general rule. See generally Fed. R. Evid. 801, 803, 804.

Rule 803(1) provides an exception to the rule against hearsay for "[a] statement describing an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). "By its own terms, application of Rule 803(1) has three distinct requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be 'substantially contemporaneous' with the event in question." United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994)(citing to Fed. R. Evid. 803(1)). The rule does not require strict contemporaneity. See United States v. Green, 556 F.3d 151, 156 (3d Cir. 2009). Instead, courts often allow for slight lapses between the event and the description of that event. See United States v. Lovato, 950 F.3d 1337, 1345 (10th Cir. 2020)("[T]he three to four-minute delay between the shooting and first descriptive statements did not destroy the necessary contemporaneity."). Courts also regularly admit 911 calls describing ongoing criminal activity as present sense impressions. See United States v. Lovato,

950 F.3d at 1343.  This exception applies even if the declarant is available to testify.  See Fed. R.

Evid. 803.

There is another exception for excited utterances.  See Fed. R. Evid. 803(2).  The rule

permits admission of "[a] statement relating to a startling event or condition, made while the

declarant was under the stress of excitement that it caused."  Fed. R. Evid. 803(2).  The Tenth

Circuit, in United States v. Smith, 606 F.3d 1270 (10th Cir. 2010), set forth a district court's

required analysis for whether a statement is admissible under the excited utterance exception:

> The so-called excited-utterance exception has three requirements: (1) a startling
> event; (2) the statement was made while the declarant was under the stress of the
> event's excitement; and (3) a nexus between the content of the statement and the
> event.  [T]here is no precise amount of time between the event and the statement
> beyond which the statement cannot qualify as an excited utterance.  Admissibility
> hinges on a statement's contemporaneousness with the excitement a startling event
> causes, not the event itself.  There is no hard time limit that must be met under Rule
> 803; what is relevant is whether the declarant is still under the excitement of the
> startling event.

606 F.3d at 1279 (internal citations and question marks omitted).  The Tenth Circuit has noted:

> Courts consider a range of factors in determining whether a declarant made
> a statement while under the stress of a particular event.  Among the more relevant
> factors are: the amount of time between the event and the statement; the nature of
> the event; the subject matter of the statement; the age and condition of the declarant;
> the presence or absence of self-interest; and whether the statement was volunteered
> or in response to questioning.

United States v. Pursley, 577 F.3d 1204, 1220 (10th Cir. 2009).  The "[p]ermissible subject matter

of the statement is [not] limited . . . to description or explanation of the event or condition . . . .

[T]he statement need only relate to the startling event or condition, thus affording a broader scope

of subject matter coverage."  United States v. Frost, 684 F.3d 963, 973 (10th Cir. 2012)(quoting

Fed. R. Evid. 803 Advisory Comm. Notes).  Courts regularly admit statements made to law

enforcement in the aftermath of violent assaults as excited utterances.  See United States v. Pursley,

577 F.3d at 1221-22 (concluding that an assault victim's statements to officers describing the assault twenty to thirty minutes after the assault were admissible as an excited utterance); United States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990)(concluding that an assault victim's statements to officers describing the assault five to six hours after the assault were admissible as an excited utterance).

Many courts across the country have found it proper to admit a 911 caller's statements as a present sense impression and/or an excited utterance.  See, e.g., United States v. Thomas, 453 F.3d 838, 841 (7th Cir. 2006)(holding that admission of a three minute and fifty-three second 911 call, in which the caller said that a man holding a handgun had shot someone outside her apartment and was still there, and in which "emergency operator . . . asked a series of questions about the facts of the situation and the caller narrated what she was seeing as it happened," was proper as either a present sense impression or excited utterance); United States v. Hawkins, 59 F.3d 723, 730 (8th Cir. 1995)(holding that the tape of a 911 emergency telephone call from defendant's wife reporting that defendant displayed a gun to wife during domestic dispute was proper as a present sense impression, because of its sufficient contemporaneity to underlying events and because of its reliability, as evidenced by wife's detailed description of the gun); United States v. Mejia-Valez, 855 F. Supp. 607 (E.D.N.Y. 1994)(concluding that admission of two callers' 911 call tape recordings as excited utterances and present sense impressions was proper, because the two callers were at the scene of the underlying shooting, the calls were placed moments after the shooting, and both men described the facts of the shooting, including giving the location and the shooter's description).

Here, the 911 Call would be admissible as a present sense impression.  See Fed. R. Evid. 803(1).[10]  During the 911 Call, Encinias "describes . . . an event": Calvert-Cata battering her.  Fed. R. Evid. 803(1).  Further, the record indicates that Encinias made the call after Calvert-Cata had beaten her and she locked herself in his car out of fear that he would continue to beat her.  See Warrant Aff. at 2.  In other words, Encinias placed the call "immediately after" Calvert-Cata had stopped battering her.  Fed. R. Evid. 803(1).  Accordingly, her statements were sufficiently contemporaneous to the battery.  For these reasons, the 911 Call would be admissible as a present sense impression under rule 803(1) of the Federal Rules of Evidence, even if she were available to testify.

Similarly, the 911 Call also is admissible as an excited utterance.  See Fed. R. Evid. 803(2).  Encinias' call related to a startling event: Calvert-Cata's battery.  In the 911 Call, she told the operator that she had locked herself into the car out of fear that Calvert-Cata would continue beating her.  Warrant Aff. at 2.  Her ongoing fear of bodily harm suggests that Encinias was still "under the stress" of the battery at the time she placed the call.  Fed. R. Evid. 803(2).  For these reasons, the 911 Call would be admissible as an excited utterance under rule 803(2) of the Federal Rules of Evidence, even if Encinias were available to testify.

---

[10]The Court does not have a recording or transcript of the 911 Call.  Instead, the Court relies, in part, on the Warrant Affidavit and the testimony presented at both revocation hearings to know what Encinias said during the 911 Call.  The Warrant Affidavit is in and of itself hearsay, but the Court relies on it because it was admitted into evidence without objection during the April 13 hearing.  April 13 Tr. at 11:13-17 (Court, Baiz)(Court asking "Any objection, Ms. Baiz?" and Calvert-Cata's counsel responding "Well, of course, Your Honor, I'll just cross-examine [Tanny] on them").  Further, Casius drafted the Warrant Affidavit.  See Warrant Aff. at 3.  Casius testified at the May 17 Hearing and was subject to cross-examination.  See May 17 Clerk's Minutes at 2.  The Court deems his testimony is accurate and reliable.

2.    **Encinias' Statements During the Initial Encounter Are Admissible Under Rule 803(2)'s Excited Utterance Exception, Regardless of Her Availability to Testify.**

Similarly, Encinias' statements during the Initial Encounter are admissible as an excited utterance.  See Fed. R. Evid. 803(2).[11]  Encinias' statements to the officers during the Initial Encounter "related to a startling event": Calvert-Cata's attack.  Fed. R. Evid. 803(2).  Further, the record evinces that Encinias made the statements while still under the stress of the battery.  Namely, Casius describes that during the Initial Encounter, Encinias was "frantic[]," "crying," "visibly shaken," and "extremely scared."  May 17 Tr. at 11:12-13 (Casius).  For these reasons, the Court finds that Encinias' made her statements during the Initial Encounter while under the stress of the battery and that those statements are therefore admissible excited utterances under rule 803(2) of the Federal Rules of Evidence, even if she were available to testify.

3.    **Encinias' Statements During the Second Encounter, in the Voluntary Statement, and in the Written Statement Are Not Admissible Under the Federal Rules of Evidence.**

Encinias' statements during the Second Encounter, in the Voluntary Statement, and in the Written Statement, however, are not admissible hearsay under the Federal Rules of Evidence.  Looking first at Encinias' statements during the Second Encounter.  Encinias' statements during

---

[11]The Court does not have a transcript of the Initial Encounter.  Instead, the Court relies, in part, on the Warrant Affidavit and the testimony presented at both revocation hearings to know what Encinias said during the Initial Encounter.  The Warrant Affidavit is in and of itself hearsay, but the Court relies on it because it was admitted into evidence without objection during the April 13 hearing.  April 13 Tr. at 11:13-17 (Baiz, Court)(Court asking "Any objection, Ms. Baiz?" and Calvert-Cata's counsel responding "Well, of course, Your Honor, I'll just cross-examine [Tanny] on them").  Further, Casius drafted the Warrant Affidavit.  See Warrant Aff. at 3.  Casius testified at the May 17 Hearing and was subject to cross-examination.  See May 17 Clerk's Minutes at 2. The Court deems his testimony is accurate and reliable.

the Second Encounter are not present sense impressions, because she did not make them "while or immediately after" Calvert-Cata battered her. Fed. R. Evid. 803(1). The record indicates that the Second Encounter happened after the officers secured Encinias in their vehicles and conducted an extensive search for Calvert-Cata. See May 17 Tr. at 9:20-21 (Casius)(describing that the officers formed a "search line" and "canvass[ed]" the surrounding area). An extensive search likely would have taken more than a few minutes and therefore would have impeded the immediacy that rule 803(1) requires. See United States v. Lovato, 950 F.3d at 1345. Similarly, the United States has not demonstrated Encinias' statements during the Second Encounter were excited utterances. The United States does not establish how much -- or how little -- time elapsed between the battery and the Second Encounter, and, importantly, the United States does not establish that Encinias was still under the stress of the battery at the time of the Second Encounter. See Fed. R. Evid. 803(2). Finally, Encinias' statements during the Second Encounter do not fall under any other exception to the rule against hearsay.

The same is true of the Voluntary Statement and the Written Statement. The statements are not present sense impressions because they were made too long after the battery. See Fed. R. Evid. 803(1); United States v. Lovato, 950 F.3d at 1345. Encinias wrote the Voluntary Statement and Written Statement after she sat in the officers' car on the scene for some time and the officers drove her to the station. See Warrant Aff. at 2. Those events would have taken more than a couple of minutes and therefore would have impeded the immediacy that rule 803(1) requires. See United States v. Lovato, 950 F.3d at 1345. The United States also does not show that Encinias was still under the stress of the battery at the time she wrote the statements. See Fed. R. Evid. 803(2).

Finally, Encinias' Voluntary Statement and Written Statement do not fall under any other exception to the rule against hearsay.

> **4.** **Encinias' Statements During the 911 Call and Initial Encounter Do Not Violate the Confrontation Clause.**

Encinias' 911 Call and her statements during the Initial Encounter would also be admissible under the Confrontation Clause. The Confrontation Clause of the Sixth Amendment of the Constitution of the United States provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford, the Supreme Court held that, consistent with the Sixth Amendment, "[t]estimonial [hearsay] statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Crawford, 541 U.S. at 59.

The primary question in Confrontation Clause cases is whether an out-of-court statement is "testimonial." Crawford, 541 U.S. at 53. In Davis v. Washington, 547 U.S. 813 (2006), the Supreme Court elaborated on what a "testimonial" statement is:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis v. Washington, 547 U.S. at 822. See also Michigan v. Bryant, 562 U.S. 344, 349 (2011) (holding that, where a suspect is at large, statements to police that will assist the police in resolving the "ongoing emergency" are not testimonial). The Tenth Circuit has clarified that a statement is testimonial when it is "a formal declaration made by the declarant that, when objectively

considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution" or "[a] formal statement" made in a situation where "a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime." United States v. Smalls, 605 F.3d 765, 778 (10th Cir.2010).

Here, neither the 911 Call nor the statements during the Initial Encounter are testimonial. Encinias made both statements "under circumstances objectively indicating that [her] primary purpose . . . [was] to enable police assistance to meet an ongoing emergency." Davis v. Washington, 547 U.S. at 822. Encinias made the 911 Call in an effort to get help after Calvert-Cata battered her. See Warrant Aff. at 2. Similarly, Encinias made her statements during the Initial Encounter to help the police find Calvert-Cata's car and Calvert-Cata, who was at large at the time. See May 17 Tr. at 9:21 (Casius). Given that both statements were made in the course of an ongoing emergency, neither are testimonial, and neither run afoul of the Confrontation Clause. See Davis v. Washington, 547 U.S. at 822.

> **5.      Admission of Encinias' Statements During the Second Encounter, in the Voluntary Statement, and in the Written Statement Would Violate the Confrontation Clause.**

Admission of Encinias' statements during the Second Encounter, in the Voluntary Statement, and in the Written Statement, however, would violate the Confrontation Clause because all three are testimonial. Looking first at her statements during the Second Encounter, the Second Encounter occurred after the officers initially had spoken to Encinias and conducted an exhaustive, but unsuccessful, search for Calvert-Cata. May 17 Tr. at 10:5-7 (Casius). The circumstances became less urgent after the officers determined that Calvert-Cata was no longer in the surrounding

area and their conversation with Encinias was no longer in the context of an "ongoing emergency." See May 17 Tr. at 9:21 (Casius)(explaining that Calvert-Cata had "fled" the scene); Davis v. Washington, 547 U.S. at 822. Instead, the "primary purpose" of the officers' questions to Encinias at that juncture was to "establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 547 U.S. at 822. A reasonable person in Encinias' shoes "would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution" of Calvert-Cata. United States v. Smalls, 605 F.3d at 778.

A similar analysis applies to the Voluntary Statement and Written Statement. Encinias produced both the Voluntary Statement and the Written Statement after the officers had taken her to the station. See Warrant Aff. at 2. At that point, there was no longer an "ongoing emergency." Davis v. Washington, 547 U.S. at 822. Both statements are "formal declaration[s] . . . that, when objectively considered, indicate[] the primary purpose for which the declaration[s were] made was that of establishing or proving some fact potentially relevant to a criminal prosecution." United States v. Smalls, 605 F.3d at 778. In the end, they are both the kinds of written out-of-court statements that Crawford and the Confrontation Clause are meant to exclude. See Crawford, 541 U.S. at 42-47 (discussing the trial of Sir Walter Raleigh and the dangers of trial by written affidavit).

**B.     CONSIDERING ENCINIAS' STATEMENTS IN THE 911 CALL AND THE INITIAL ENCOUNTER, THE COURT CONCLUDES BY A PREPONDERANCE OF THE EVIDENCE THAT CALVERT-CATA COMMITTED A BATTERY AGAINST ENCINIAS.**

N.M.S.A. § 30-3-16 provides in relevant part:

> A.     Aggravated battery against a household member consists of the unlawful touching or application of force to the person

of a household member with intent to injure that person or another.

. . .

C.    Whoever commits aggravated battery against a household member is guilty of a third degree felony if the aggravated battery against a household member is committed:

    (1)    by inflicting great bodily harm;

    . . . .

    (3)    by strangulation or suffocation; or

    (4)    in any manner whereby great bodily harm or death can be inflicted.

N.M.S.A. § 30-3-16.  N.M.S.A. § 30-3-11 clarifies that a "household member" is "a person with whom a person has had a continuing personal relationship.  Cohabitation is not necessary to be deemed a household member . . . ."  N.M.S.A. § 30-3-11.  Section 30-3-11 also defines "strangulation" as "the unlawful touching or application of force to another person's neck or throat with intent to injure that person and in a manner whereby great bodily harm or death can be inflicted, the result of which impedes the person's normal breathing or blood circulation."

Here, a preponderance of the evidence supports a finding that Calvert-Cata strangled Encinias on November 14, 2021.  To start, the evidence shows that Calvert-Cata and Encinias were dating and were therefore "household members" within N.M.S.A. § 30-3-16(C) and N.M.S.A. § 30-3-11's meaning.  See Warrant Aff. at 2 (explaining that during the 911 Call, Encinias described Calvert-Cata as her "boyfriend").

Second, a preponderance of the evidence also suggests that Calvert-Cata unlawfully applied force to Encinias' neck or throat on November 14, 2021.  See N.M.S.A. §§ 30-3-11,

30-3-16(C)(3).  In the 911 Call, Encinias said that Calvert-Cata had "battered" her.  Warrant Aff. at 2.  Similarly, during the Initial Encounter, she said that Calvert-Cata had "punched . . . [and] choked" her.  Warrant Aff. at 2.  The bruises and markings on her face, see Encinias Photos I, III, IV, neck, see Encinias Photo II, and arm, see Encinias Photo I, corroborate her story.  Further, Casius concluded that, based on his training and experience, the markings on Encinias' body were "something that she had sustained that evening."  May 17 Tr. at 12:5-6 (Casius).  Taken together, Encinias' statements, Casius' testimony, and the location and extent of Encinias' bruising, support a finding that it is more likely than not that Calvert-Cata unlawfully applied force to Encinias' neck.  Accordingly, the Court concludes that Calvert-Cata strangled Encinias on November 14, 2021.

A preponderance of the evidence also indicates that Calvert-Cata strangled Encinias with "intent to injure" her.  N.M.S.A. § 30-3-16(C).  During the Initial Encounter, Encinias said that Calvert-Cata had threatened to "rape and kill her."  Warrant Aff. at 2.  The officers also noted that during the Initial Encounter, she was "crying and visibly shaken, extremely scared." May 17 Tr. at 6:13-14 (Casius).  Encinias also had several bruises and marks on her face, see Encinias Photos I, III, IV, neck, see Encinias Photo II, and arm, see Encinias Photo I.  Taken together, Calvert-Cata's threats and Encinias' demeanor and injuries, support a finding that Calvert-Cata purposefully hurt Encinias.  Accordingly, the Court finds that it is more likely than not that Calvert-Cata acted with intent to injure on November 14, 2021.  For these reasons, the Court concludes that a preponderance of the evidence supports a finding that Calvert-Cata violated his supervised release mandatory condition by strangling Encinias on November 14, 2021, in violation of N.M.S.A. § 30-3-16(C).

### C.    WITH THE RELIABLE EVIDENCE IN THE 911 CALL AND THE INITIAL ENCOUNTER, THE COURT CONCLUDES BY A PREPONDERANCE OF THE EVIDENCE THAT THE RECORD DOES NOT SUPPORT A FINDING THAT CALVERT-CATA KIDNAPPED ENCINIAS.

N.M.S.A. § 30-4-01(A) provides in relevant part:

> (A)    Kidnapping is the unlawful taking, restraining, transporting or confining of a person, by force, intimidation or deception, with intent:
>
> > (1)    that the victim be held for ransom;
> >
> > (2)    that the victim be held as a hostage or shield and confined against his will;
> >
> > (3)    that the victim be held to service against the victim's will; or
> >
> > (4)    to inflict death, physical injury or a sexual offense on the victim.

N.M.S.A. § 30-4-01(A).   In other words, kidnapping under § 30-4-01(A) has three essential elements: (i) unlawful taking, restraining, transporting, or confining; (ii) use of force, intimidation, or deception; and (iii) intent.   Here, if this revocation hearing were a trial, there would be insufficient admissible evidence to find, by a preponderance of the evidence, that Calvert-Cata kidnapped Encinias.

First, a preponderance of the evidence supports a finding that that Calvert-Cata used "force" and "intimidation" against Encinias.   N.M.S.A. § 30-4-01(A).   New Mexico State courts have interpreted "force" to require "only [a showing of] minimal force."   State v. Clark, 1969-NMSC-078, ¶ 7, 455 P.2d 844, 846, 80 N.M. 340, 342.   "Intimidation," on the other hand, requires a showing the defendant put the victim "in fear," which "may result from words or conduct."   State v. Laguna, 1999-NMCA-152, ¶ 5, 992 P.2d 896, 899, 128 N.M. 345, 348.

"Intimidation creates an apprehension of danger of bodily harm while also reducing the victim's ability to resist the advances toward that harm." State v. Laguna, 1999-NMCA-152, ¶ 5, 992 P.2d at 899, 128 N.M. at 348.  There is evidence of both force and intimidation here.  During the 911 Call, Encinias told the operator that Calvert-Cata had "battered" her.  Warrant Aff. at 2.  She also told the officers during the Initial Encounter that Calvert-Cata had "punched, choked, and threatened to rape and kill her."  Warrant Aff. at 2.  The bruises and markings on her face, see Encnias Photos I, III, IV, neck, see Encinias Photo II, and arm, see Encinias Photo I, corroborate her statements.  That evidence supports a finding that Calvert-Cata not only used force against Encinias, but also placed her in fear of greater bodily harm.  See State v. Clark, 1969-NMSC-078, ¶ 7, 455 P.2d at 846, 80 N.M. at 342; State v. Laguna, 1999-NMCA-152, ¶ 5, 992 P.2d at 899, 128 N.M. at 348.  For these reasons, the Court finds that Calvert-Cata used force and intimidation against Encinias.

A preponderance of the evidence also suggests that Calvert-Cata intended to injure Encinias.  State courts have determined that "evidence of injury may be used . . . as circumstantial evidence of intent."  State v. Sotelo, 2013-NMCA-028, ¶ 16, 296 P.3d 1232, 1238.  Accordingly, Encinias' injuries provide circumstantial evidence of Calvert-Cata's intent to injure her.  See Encinias Photos I, II, III, IV.  Further, Encinias told the officers during the Initial Encounter that Calvert-Cata had threatened to "rape and kill her," which is further evidence of his intent to harm her.  Warrant Aff. at 2.  For these reasons, the Court finds by a preponderance of the evidence that Calvert-Cata intended to injure Encinias.

There is, however, insufficient evidence admissible under the Federal Rules of Evidence and Crawford to support a finding that Calvert-Cata unlawfully took, restrained, transported, or

confined Encinias.  State courts long have interpreted "unlawful" to mean "without excuse or justification."  Territory v. Gonzales, 1907-NMSC-007, ¶ 19, 89 P. 250, 252.  Consent or voluntariness can provide a sufficient excuse or justification in the kidnapping context.  See State v. Jacobs, 2000-NMSC-026, ¶ 24, 10 P.3d 127, 137, 129 N.M. 448, 458.  It follows that a lawful interaction can become a kidnapping if the victim withdraws his or her consent at some point during the interaction.  See State v. Jacobs, 2000-NMSC-026, ¶ 24, 10 P.3d at 137, 129 N.M. at 458.  In light of the facts on the record, the Court cannot say that it is more likely than not that Calvert-Cata transported Encinias without her consent or some other justification.  It is possible that Calvert-Cata relied on force or deceit to compel Encinias to drive to Española with him.  It is also possible that Encinias agreed to go with Calvert-Cata.  It is also plausible that Encinias initially agreed to the trip, but withdrew her consent at some point along the way.  Ultimately, there are many competing interpretations of what happened on November 14, 2021, yet there is not sufficient evidence admissible under the Federal Rules of Evidence and Crawford to determine by a preponderance of the evidence which of those interpretations is correct.  For these reasons, the Court cannot say, on the basis of the evidence admissible under the Federal Rules of Evidence and Crawford, that it was more likely that not that Calvert-Cata drove Encinias to Española without justification or excuse.  The Court, therefore, concludes that a preponderance of the evidence does not show that Calvert-Cata kidnapped Encinias.

## II.    EVEN IF THE COURT MUST USE THE <u>JONES</u> ANALYSIS AND REQUIRE THE UNITED STATES TO EXPLAIN ENCINIAS' ABSENCE AT THE REVOCATION HEARING, THE ADMISSIBILITY OF ENCINIAS' STATEMENTS DURING THE 911 CALL AND THE INITIAL ENCOUNTER UNDER THE FEDERAL RULES OF EVIDENCE AND <u>CRAWFORD</u> PROVIDE GOOD CAUSE NOT TO CALL HER AT THE REVOCATION HEARING.

If the Court must sift through the <u>Jones</u> analysis, the fact that Encinias' statements in the 911 Call and during the Initial Encounter would have been admissible under the Federal Rules of Evidence and <u>Crawford</u>, regardless of her availability to testify, is good cause under <u>Jones</u> not to call Encinias to testify at the revocation hearing.  If the United States had relied on Encinias' statements in the 911 Call and during the Initial Encounter at trial, it would not have had to explain her unavailability.  Accordingly, the United States should not have to explain her unavailability at the revocation hearing.  Instead, the fact that Encinias' statements in the 911 Call and Initial Encounter would have been admissible at under the Federal Rules of Evidence and <u>Crawford</u> is good cause not to call her to testify to those statements at the revocation hearing.

The Tenth Circuit applies the <u>Jones</u> test where the United States relies on out-of-court testimony from a non-testifying declarant at a revocation hearing.  <u>See Jones</u>, 818 F.3d at 1097-98.  The test requires the Court to "balanc[e] (1) 'the [defendant]'s interest in the constitutionally guaranteed right to confrontation' against (2) 'the government's good cause for denying it.'"  <u>Jones</u>, 818 F.3d at 1100 (quoting Advisory Committee's Note to the 2002 Amendment to Fed. R. Crim. P. 32.1).  Courts have concluded that the United States has good cause not to call a witness where the United States has offered a variety of justifications for a witness' absence.  For example, courts have concluded that the United States has good cause not to call a witness where: (i) the witness is afraid of the defendant, <u>see United States v. Rondeau</u>, 430 F.3d 44, 49 (1st Cir. 2005); (ii) the United States does not want to revictimize the witness, <u>see United States v. Peguero</u>, 34

F.4th 143, 155 (2d Cir. 2022); or (iii) where the United States cannot locate a witness, United States v. Hall, 419 F.3d 980, 988 (9th Cir. 2005). Here, the Court concludes that the United States has good cause not to call a declarant when the declarant's out-of-court statements would be admissible under the Federal Rules of Evidence and Crawford, even if the declarant was available to testify at the revocation hearing.

This understanding of good cause is desirable for several reasons. First, this conclusion will ensure that courts presiding over revocation hearings are able to consider as much evidence as their counterparts presiding over criminal trials. It will prevent courts from having to turn a blind eye to evidence in a revocation hearing that otherwise would be admissible in a trial. For that reason, this rule will better embody the underlying goals of rule 32.1 and Morrissey v. Brewer -- flexibility and inclusivity -- than requiring the United States to explain its decision not to call a declarant. See Fed. R. Crim. P. 32.1; Morrissey v. Brewer, 408 U.S. at 489. It will allow courts to consider a wider range of competent evidence when deciding whether to revoke a defendant's supervised release.

Second, this rule will also remove the "additional hurdle that applies post-conviction that does not apply pre-conviction." United States v. Alvear, 818 F.3d at 184 (Oldham, J., concurring). It should be emphasized that, in trials, the United States does not have to explain why it does not call a witness when it offers evidence under rule 803. See Fed. R. Evid. 803(1). If a witness' statements are admissible at trial, the United States does not have to call that witness or explain why it is not calling the witness, even if the witness is available. See Fed. R. Evid. 803. The Jones test, by contrast, requires the United States to show good cause for not calling that same witness at a revocation hearing. See Jones, 818 F.3d at 1099-100. In so doing, the Jones test adds an

"additional hurdle that applies post-conviction that does not apply pre-conviction."  United States v. Alvear, 818 F.3d at 184 (Oldham, J., concurring).  The Court's conclusion here removes that hurdle and allows the United States to show good cause where it can demonstrate that out-of-court statements would be admissible under the Federal Rules of Evidence and Crawford.  It will relieve the United States from needing to justify its decision not to call a declarant to testify as to his or her out-of-court statements in a revocation hearing, where it would not have to justify its decision not to call that same declarant in a trial context.

Finally, in so doing, it will harmonize courts' approaches to admissible out-of-court statements in the revocation context and in the trial context.  If a party in a trial offers hearsay that is admissible under rule 803, the party need not explain why the declarant is unavailable.  Instead, the fact that the hearsay is admissible is reason enough to admit it.  The same result should be the case in revocation hearings: if the out-of-court statement is plainly admissible under the Federal Rules of Evidence and Crawford, the Court should consider it and the party offering it should not be required to justify the declarant's absence.

Applied here, that rule indicates that the United States can demonstrate good cause for not calling Encinias to testify as to the 911 Call and her statements during the Initial Encounter at either of the revocation hearings.  As described above, both are admissible under rule 803.  See Fed. R. Evid. 803(1), (2).  Further, for the reasons described above, neither are testimonial and therefore both are admissible under Crawford.  See Crawford, 541 U.S. at 53.  Accordingly, both would be admissible, regardless of Encinias' availability, if they were offered at trial.  That the 911 Call and Encinias' statements during the Initial Encounter are admissible under the Federal Rules of Evidence and Crawford establishes that the United States has good cause for not calling

Encinias to testify to those out-of-court statements at the revocation hearings, and it does not need to explain its decision not to call her to testify.

III.      **IF THE EVIDENCE ADMISSIBLE AT TRIAL UNDER THE FEDERAL RULES OF EVIDENCE AND <u>CRAWFORD</u>, REGARDLESS OF THE WITNESS' AVAILABILITY, MUST BE RUN THROUGH THE <u>JONES</u> TEST, AND IF THE FACT THAT THE EVIDENCE IS ADMISSIBLE AT TRIAL DOES NOT ALONE PROVIDE GOOD CAUSE, THEN ENCINIAS' STATEMENTS IN THE 911 CALL AND INITIAL ENCOUNTER ARE NOT ADMISSIBLE BECAUSE THE UNITED STATES HAS NOT SHOWN GOOD CAUSE.**

If the Court must run the evidence through the <u>Jones</u> balancing test, and the fact that the evidence would be admissible at trial does not alone amount to good cause, then Encinias' statements in the 911 Call and Initial Encounter are not admissible because the United States has not otherwise shown good cause. The United States offers three justifications for Encinias' absence at the revocation hearings, but none amount to good cause. Nevertheless, even if the United States cannot show good cause for not calling Encinias to testify at either revocation hearing, and the Court disregards all of her out-of-court statements, there is still sufficient evidence to show by a preponderance of the evidence that Calvert-Cata committed a battery against Encinias.

A.      **IF THE EVIDENCE MUST BE RUN THROUGH THE <u>JONES</u> TEST, AND IF THE FACT THAT THE EVIDENCE IS ADMISSIBLE AT TRIAL DOES NOT ALONE PROVIDE GOOD CAUSE, THEN ENCINIAS' STATEMENTS IN THE 911 CALL AND INITIAL ENCOUNTER ARE NOT ADMISSIBLE BECAUSE THE UNITED STATES HAS NOT OTHERWISE SHOWN GOOD CAUSE.**

The United States offers three justifications for not calling Encinias as a witness at either revocation hearing, but none amount to good cause. At the revocation hearings, the United States offered three reasons for not calling Encinias: (i) Encinias is afraid of testifying against Calvert-

Cata; (ii) the United States does not want to retraumatize Encinias by having her testify; and (iii) the United States does not want to complicate the parallel prosecution in State court. See May 17 Tr. at 48:1-49:4 (Nayback). The Court concludes that, based on the evidence before it in the record, none of these three reasons amount to good cause under Jones. See Jones, 818 F.3d at 1100.

First, that Encinias is afraid of testifying against Calvert-Cata does not mean that the United States has good cause not to call her as a witness. See Jones, 818 F.3d at 1100. Fear can amount to good cause in certain cases. See, e.g., United States v. Rondeau, 430 F.3d 44, 49 (1st Cir. 2005); United States v. Peguero, 34 F.4th at 155; United States v. Alvear, 959 F.3d at 190. In cases where courts have allowed fear to provide the basis for good cause, however, the evidence of fear has been well substantiated in the record. See United States v. Alvear, 959 F.3d at 190 (concluding that there was "ample record evidence justifying an inference that [the witness] was too afraid to testify" where the witness had demonstrated a history of fearing the defendant"). The evidence of fear here is less robust and is insufficient to show good cause under Jones. The United States noted at the May 17 hearing that Encinias "hemmed and hawed" before asserting that she was afraid of testifying against Calvert-Cata. May 17 Tr. at 47:1-7 (Nayback). Tellingly, the United States did not raise the fear issue at the first hearing at all. While the Court takes Mr. Nayback at his word, the Court thinks that there should be an affidavit or a declaration addressing Encinias' fear so it can judge Encinias' degree of fear itself. If the United States has to explain her absence under Jones, taken together, these considerations cast doubt on the strength of Encinias' fear and prevent the Court from finding that her alleged fear provides good cause for not calling her as a witness.

Similarly, the United States' stated interest in not retraumatizing Encinias does not amount

to good cause.  See Jones, 818 F.3d at 1098.  Like fear, retraumatization can provide the basis for good cause under Jones.  See United States v. Peguero, 34 F.4th at 155-56.  Yet, also like in the case of fear, the record must provide evidence to support that finding.  See United States v. Peguero, 34 F.4th at 156 (concluding that the risk of retraumatization is good cause in an intimate-partner-violence case where the witness could show that the defendant's violence caused her to have seizures and anxiety, and that she was afraid that testifying would retrigger those health issues).  That evidence is lacking here.  The Court believes that Encinias' story is accurate: the Court does not doubt that the events of November 14, 2021, were traumatizing.  Yet the United States has not offered any evidence to substantiate its contention that calling Encinias as a witness would retraumatize her.  The Court is left to speculate whether testifying would have a detrimental impact on Encinias.  If the State had proceeded with its prosecution of Calvert-Cata, Encinias would have needed to testify in that proceeding.  Similarly, the State system allows for some pretrial discovery.  See generally N.M. Code R. art. 5 (outlining the discovery procedures available in New Mexico State proceedings).  She likely would have had to be interviewed before trial and tell her story twice in the State system.  See N.M. Code. R. § 5-503(A) (establishing that "[a]ny person, other than the defendant, with information which is subject to discovery shall give a statement").  The Court does not think it should excuse Encinias in this proceeding when she would have had to appear, participate, and tell her story in the State court proceeding.  For these reasons, if the United States must justify Encinias' absence, the Court concludes that the risk of retraumatization does not amount to good cause here.

Finally, the United States' interest in not complicating the State court proceeding does not amount to good cause.  See Jones, 818 F.3d at 1100.  Unlike fear and retraumatization, no court

has determined that the risk of complicating a state proceeding provides the basis for good cause. It seems that the United States and the State do not want Calvert-Cata's defense counsel in the State proceeding to have the transcript of Encinias' testimony in a federal revocation hearing to use for cross examining her in the State trial.  While that concern is valid, that concern does not justify not having her testify here.  If the Court were to accept that rationale, it would excuse practically every victim in every revocation proceeding.  Further, accepting that rationale would infringe on Calvert-Cata's rule 32.1 confrontation rights here, and his confrontation rights in the State proceeding.  For these reasons the Court concludes that the risk of complicating the State proceeding does not amount to good cause.[12]

**B.     EVEN IF THE COURT CANNOT CONSIDER ANY OF ENCINIAS' OUT-OF-COURT STATEMENTS, THERE IS SUFFICIENT EVIDENCE FOR THE COURT TO FIND BY A PREPONDERANCE OF THE EVIDENCE THAT CALVERT-CATA COMMITTED A BATTERY.**

Even if the United States cannot show, under Jones, good cause for not calling Encinias at either revocation hearing and the Court disregards all of Encinias' out-of-court statements, there still is enough reliable evidence on the record to show by a preponderance of the evidence that Calvert-Cata battered Encinias.[13]  To start, the evidence shows that Calvert-Cata and Encinias

---

[12]For the reasons stated, the Court would have rejected this justification even if the State was proceeding with its prosecution of Calvert-Cata.  The Court concludes that the justification holds even less water now that the State has dismissed its charges against Calvert-Cata.  See Nolle Prosequi, filed October 14, 2022 (Doc. 110-1).

[13]If the Court disregards all of Encinias' out-of-court statements, its analysis on the kidnapping allegation remains unchanged.  As discussed above, if the Court considers the 911 Call and Encinias' statements during the Initial Encounter, there is insufficient evidence to find by a preponderance of the evidence that Calvert-Cata kidnapped Encinias.  It follows that if the Court considers none of the Encinias' out-of-court statements, there is even less evidence to show kidnapping.

were involved romantically, and therefore are "household members" within N.M.S.A. § 30-3-16(C) and N.M.S.A. § 30-3-11's meaning.  See April 13 Tr. at 13:2-4 (Tanny).

Second, a preponderance of the evidence also supports a finding that someone unlawfully applied force to Encinias' neck or throat on November 14, 2021.  See N.M.S.A. §§ 30-3-16(C), 30-3-11.  When the responding officers encountered Encinias, she had bruises and other markings on her face, see Encinias Photos I, III, IV, neck, see Encinias Photo II, and arm, see Encinias Photo I.  Casius believed that, based on his training and experience, the markings on Encinias' body were "something that she had sustained that evening."  May 17 Tr. 12:5-6 (Casius).  Based on the officer's testimony and the location and extent of bruising on Encinias' body, the Court concludes that it is more likely than not that someone unlawfully applied force to her body, including her neck, on November 14, 2021.

The Court also infers that Calvert-Cata is the person who applied that force to Encinias' neck on November 14, 2021.  At the time that the officers encountered Encinias, she was running out of the tree line in a rural area.  See May 17 Tr. at 7:9-14, 8:1-9:11 (Casius).  She was running away from a vehicle further up the road, and the officers later determined that the vehicle was registered in Calvert-Cata's name and that Encinias was in Calvert-Cata's vehicle "prior to her approaching and running up to [them] frantically."  May 17 Tr. at 7:9-14 (Casius); id. at 9:9-12 (Casius); id. at 10:7-8 (Casius).  There is no evidence on the record which suggests that there were other cars or structures in the area.  In light of those circumstances, it is more likely than not that Encinias was fleeing from Calvert-Cata, because he had inflicted the bruises and marks that were on her face, see Encinias Photos I, III, IV, neck, see Encinias Photo II, and arm, see Encinias Photo I.

Finally, a preponderance of the evidence indicates that Calvert-Cata strangled Encinias with "intent to injure" her.  N.M.S.A. § 30-3-16(C).  Defendants rarely confess their intent and courts often have to infer intent from circumstantial evidence.  The circumstantial evidence here evinces that Calvert-Cata acted with intent to injure Encinias.  Encinias sustained several bruises and marks to her face, see Encinias Photos I, III, IV, neck, see Encinias Photo II, and arm, see Encinias Photo I.  The location and extent of her bruising make it more likely than not that the injuries were the result of intentionally applied force rather than an accidental bump or push.  Further, when the officers encountered Encinias, she was "crying and visibly shaken, extremely scared."  May 17 Tr. at 6:13-14 (Casius).  The Court reasonably can infer that an intentional act of violence would upset Encinias more than an accidental or negligent application of force.  Accordingly, the Court finds that it is more likely than not that Calvert-Cata purposefully applied force to Encinias' neck and intended to cause her harm.  For these reasons, even absent Encinias' out-of-court statements, the Court finds that a preponderance of the evidence supports a finding that Calvert-Cata violated a condition of his supervised release by strangling Encinias on November 14, 2021, in violation of N.M.S.A. § 30-3-16(C).

**IT IS ORDERED** that: (i) the Court finds that Peter Calvert-Cata strangled Thelma Encinias on November 14, 2021, in violation of  N.M.S.A. § 30-3-16(C); (ii) the Court finds that Calvert-Cata violated his supervised release special condition by committing a Grade A violation; and (iii) the United States Sentencing Guidelines establish a revocation imprisonment range of 24 to 30 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Alexander M.M. Uballez
  United States Attorney
Kyle T Nayback
  Assistant United States Attorney
United State Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Margaret Katze
  Federal Public Defender
Sylvia A. Baiz
  Assistant Federal Public Defender
Office of the Federal Defender
Albuquerque, New Mexico

      *Attorneys for the Defendant*

- 49 -